**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| SYLVIA RABO, an individual,<br><br>Plaintiff,<br><br>v.<br><br>ESSENTIA HEALTH, a non-profit<br>Minnesota corporation,<br><br>Defendant. | Case No. 0:25-cv-04407-ECT-LIB<br><br>**DEFENDANT<br>ESSENTIA HEALTH'S<br>MEMORANDUM OF LAW IN<br>SUPPORT OF ITS PARTIAL<br>MOTION TO DISMISS** |

**TABLE OF CONTENTS**

**Page**

STATEMENT OF RELEVANT FACTS...........................................................................1

    I.      Plaintiff's Employment with Essentia............................................................1

    II.    September–December 2024: Plaintiff Complains about Staffing and Scheduling Issues. ..........................................................................................3

    III.   December 30, 2024: Bellefeuille Complains about Plaintiff. ......................4

    IV.   January 20, 2025: Plaintiff Asks Human Resources to Reopen Investigation into Neugebauer. ......................................................................5

    V.    February 20, 2025–May 16, 2025: Plaintiff Receives Performance Improvement Plan and Neugebauer Allegedly Makes Inappropriate Racial and Sexual Comments.........................................................................5

    VI.   May 16, 2025: After Being Confronted about Absences during the Workday, Plaintiff Discloses She Is Breastfeeding at Work. ......................6

    VII.   May 20–28, 2025: After Being Confronted with Performance Issues, Plaintiff Makes Complaints to Human Resources. ......................................7

    VIII.  June 2025: Essentia Terminates Plaintiff's Employment. ...........................8

LEGAL STANDARD ...................................................................................................8

ARGUMENT.................................................................................................................9

    I.      Choice of Law. ...........................................................................................10

    II.    Plaintiff's Retaliation Claim (Count I) Fails. .............................................11

    III.   Plaintiff's Discrimination Claim (Count II) Fails. ....................................12

    IV.   Plaintiff's Sexual Harassment/Hostile Work Environment Claim (Count III) Fails.........................................................................................17

    V.    Plaintiff's Sex Discrimination in Violation of N.D.C.C. § 14-02.4-03(2) Claim (Count IV) Fails. .................................................................19

    VI.   Plaintiff Cannot Maintain a Claim of Negligent Hiring, Supervision, or Retention (Count VI). ..........................................................................21

    VII.   Plaintiff's Wrongful Termination in Violation of Public Policy Claim (Count VII) Fails. ..........................................................................23

    VIII.  Plaintiff's Claim for Intentional Infliction of Emotional Distress (Count VIII) Fails..........................................................................................24

          A.    The Alleged Conduct is Not Extreme or Outrageous. ...................25

B.    There Is No Theory of Liability for Neugebauer's Alleged Comments..................................................................................26

CONCLUSION ................................................................................27

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Ahern v. Shinseki*,
2009 WL 1615402 (D.R.I. June 9, 2009) .................................................................. 15

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......................................................................................... 8

*Auer v. City of Minot*,
2017 WL 5894999 (D.N.D. Feb. 8, 2017) .................................................................. 11

*Bakken v. N. Am. Coal Corp.*,
641 F. Supp. 1015 (D.N.D. 1986) .................................................................. 24

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......................................................................................... 8

*Bolinske v. Sandstrom*,
978 N.W.2d 72 (N.D. 2022) .................................................................. 27

*Brogren v. Pohlad*,
933 F. Supp. 793 (D. Minn. 1995) .................................................................. 9

*Chase v. Ashcroft*,
2004 WL 2238793 (D.N.D. Sept. 29, 2004) .......................................................... 13, 14

*Dahlberg v. Lutheran Soc. Servs. of N.D.*,
625 N.W.2d 241 (N.D. 2001) .................................................................. 11, 25

*Duncan v. Delta Consol. Indus., Inc.*,
371 F.3d 1020 (8th Cir. 2004) .................................................................. 13

*E.E.O.C. v. Cudd Energy Servs.*,
2016 WL 11494742 (D.N.D. Oct. 11, 2016) .................................................................. 12

*Est. of Hopfinger ex rel. Hopfinger v. U.S. Bank Nat'l Ass'n*,
768 F. Supp. 3d 977 (D. Minn. 2025) .................................................................. 10

*G.K.T. v. T.L.T.*,
798 N.W.2d 872 (N.D. 2011) .................................................................. 26

*Givens v. Cingular Wireless*,
396 F.3d 998 (8th Cir. 2005) .................................................................. 16

*Hubbard v. United Press Int'l, Inc.*,
    330 N.W.2d 428 (Minn. 1983)................................................................................26

*Hysjulien v. Hill Top Home of Comfort, Inc.*,
    827 N.W.2d 533 (N.D. 2013) ...............................................................17, 18, 25

*Jacob v. Nodak Mut. Ins. Co.*,
    693 N.W.2d 604 (N.D. 2005) ..............................................................................11

*Jose v. Norwest Bank N.D., N.A.*,
    599 N.W.2d 293 (N.D. 1999) ..............................................................................23

*Koehler v. County of Grand Forks*,
    658 N.W.2d 741 (N.D. 2003) ..............................................................................21

*Kongelf v. Sears Holding Corp.*,
    2010 WL 1977955 (D.N.D. Apr. 12, 2010)........................................................22

*Krause v. Bobcat Co.*,
    297 F. Supp. 2d 1212 (D.N.D. 2003)...................................................................25

*Kulik v. Med. Imaging Res., Inc.*,
    2008 WL 2415360 (E.D. Mich. June 12, 2008)...................................................15

*Lee v. Walstad*,
    368 N.W.2d 542 (N.D. 1985) ..............................................................................23

*Mentz v. United States*,
    359 F. Supp. 2d 856 (D.N.D. 2005).....................................................................27

*Menze v. Astera Health*,
    2024 WL 776773 (D. Minn. Feb. 26, 2024) ..........................................................1

*Miller v. Medcenter One*,
    571 N.W.2d 358 (N.D. 1997) .......................................................................13, 14

*Missouri ex rel. Nixon v. Coeur D'Alene Tribe*,
    164 F.3d 1102 (8th Cir. 1999) ...............................................................................9

*Molloy v. Blanchard*,
    115 F.3d 86 (1st Cir.1997)...................................................................................13

*Moore v. Shands Jacksonville Med. Ctr., Inc.*,
    2013 WL 12178163 (M.D. Fla. Oct. 18, 2013) ...................................................15

*Mosley v. Alpha Oil & Gas Servs., Inc.*,
    962 F. Supp. 2d 1090 (D.N.D. 2013)...................................................................11

*Nelson v. Gilette*,
   571 N.W.2d 332 (N.D. 1997) ................................................................ 27

*Onyiah v. St. Cloud State Univ.*,
   655 F. Supp. 2d 948 (D. Minn. 2009) .................................................. 26

*Piper Jaffray Cos. v. Nat'l Union Fire Ins. Co.*,
   967 F. Supp. 1148 (D. Minn. 1997) ...................................................... 9

*Porous Media Corp. v. Pall Corp.*,
   186 F.3d 1077 (8th Cir. 1999) ......................................................... 1, 8

*Ramirez v. Walmart*,
   915 N.W.2d 674 (N.D. 2018) ......................................................... 11, 12

*Richard v. Washburn Pub. Sch.*,
   809 N.W.2d 288 (N.D. 2011) ......................................................... 21, 22

*Richter v. Advance Auto Parts, Inc.*,
   686 F.3d 847 (8th Cir. 2012) ........................................................ 23, 24

*Rodgers v. U.S. Bank, N.A.*,
   417 F.3d 845 (8th Cir. 2005) .............................................................. 13

*Sadler v. Basin Elec. Power Coop.*,
   409 N.W.2d 87 (N.D. 1987) ................................................................ 26

*Sandoval v. Am. Bldg. Maint. Indus., Inc.*,
   765 F. Supp. 2d 1138 (D. Minn. 2010) ................................................ 18

*Schlenk v. Nw. Bell Tel. Co.*,
   329 N.W.2d 605 (N.D. 1983) .............................................................. 21

*Spagnolia v. Charter Commc'ns, LLC*,
   2023 WL 3317781 (D. Colo. May 5, 2023) .......................................... 19

*St. Hilaire v. Minco Prods., Inc.*,
   288 F. Supp. 2d 999 (D. Minn. 2003) .................................................. 22

*Tashman v. Advance Auto Parts, Inc.*,
   63 F.4th 1147 (8th Cir. 2023) ............................................................. 27

*Van Klootwyk v. Baptist Home, Inc.*,
   665 N.W.2d 679 (N.D. 2003) .............................................................. 26

## Statutes, Rules & Regulations

29 U.S.C. § 218d ................................................................................................... 20

42 U.S.C. § 2000gg(4) .......................................................................................... 20

Fed. R. Civ. P. 8(a)(2) ............................................................................................. 8

Fed. R. Civ. P. 12 ........................................................................................ 1, 8, 9, 12

Fed. R. Civ. P. 56 .................................................................................................... 9

N.D.C.C. § 14-02.4-02 .......................................................................................... 17

N.D.C.C. § 14-02.4-03 ..................................................................................... *passim*

N.D.C.C. § 34-01-20 ............................................................................... 9, 11, 12, 27

N.D.C.C. § 34-03-01 .............................................................................................. 22

## Other Authorities

2023 N.D. Sess. l. Chapter 142 .............................................................................. 19

*House Bill 1450 – Pregnant Workers Protection* (Mar. 8, 2023) ...................................... 20

Defendant Essentia Health ("Essentia"), by and through the undersigned counsel, respectfully submits this Memorandum of Law in support of its Partial Motion to Dismiss Plaintiff's Complaint[1] pursuant to Federal Rule of Civil Procedure 12(b)(6). By this Motion, Essentia seeks to dismiss Counts I, II, III, IV, VI, VII, and VIII of Plaintiff's Complaint for failure to state a claim.

## STATEMENT OF RELEVANT FACTS[2]

### I.      Plaintiff's Employment with Essentia.

Essentia is an integrated health system serving patients in Minnesota, North Dakota, and Wisconsin. (Essentia Health, About Us, https://essentiahealth.org/about (last visited Dec. 12, 2025).) Essentia operates a highly acclaimed Heart and Vascular Center in Fargo, North Dakota, which employs perfusionists. (Compl. ¶ 17.) In 2023, Plaintiff Sylvia Rabo ("Plaintiff") was offered and accepted the position of "perfusionist – surgery" at Essentia's Fargo Heart and Vascular Center. (*Id.* ¶¶ 15, 16.)

---

[1] By bringing this Partial Motion to Dismiss, Essentia's time to answer to the Complaint is stayed pending the Court's decision on the motion. *Menze v. Astera Health*, 2024 WL 776773, at *1 (D. Minn. Feb. 26, 2024) ("When a defendant files a pre-answer motion to dismiss under Fed. R. Civ. P. 12(b), even one that challenges fewer than all the claims in complaint, the defendant's time to file an answer is extended until after the court rules on the motion."). Essentia reserves the right to answer any claims that survive this Partial Motion to Dismiss and assert affirmative defenses at the appropriate time.

[2] While many of the facts Plaintiff alleges in her Complaint are inaccurate and Essentia vehemently denies any wrongdoing with respect to Plaintiff's employment with the Company, Essentia accepts Plaintiff's allegations as true solely for purposes of this Motion. Essentia also incorporates documents that are referenced by the Complaint and central to Plaintiff's claims in this Motion to Dismiss. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

When Plaintiff was hired by Essentia, Carl Moser was the Chief Perfusionist. (*Id.* ¶ 20.) Plaintiff and Moser were the only full-time perfusionists at that time. (*Id.* ¶¶ 21, 31.) Plaintiff initially reported to Mandy Henderson. (*Id.* ¶ 20.) After Henderson left Essentia, Plaintiff reported to Moser. (*Id.* ¶ 26.)

On June 14, 2024, Moser died, and Plaintiff began reporting to the head of the cardiac department, Duane Neugebauer. (*Id.* ¶¶ 30, 189.) About a week after Moser's passing, Neugebauer offered Plaintiff (the only remaining full-time perfusionist on staff) the position of Chief Perfusionist. (*Id.* ¶¶ 31, 33.) Plaintiff accepted the position. (*Id.* ¶ 33.)

Thereafter, Plaintiff told Neugebauer that she believed the Heart and Vascular Center needed to hire a second full-time perfusionist to comply with non-mandatory guidelines set by the American Society of ExtraCorporeal Technology ("AmSECT").[3] (*Id.* ¶ 35; *see* AmSECT, Standards and Guidelines, https://amsect.org /policy-practice/amsects-standards-and-guidelines (last visited Dec. 12, 2025).) Plaintiff believed that her work expectations—7:00 a.m. to 3:00 p.m. Monday through Friday and being on-call for all procedures that occurred on evenings and weekends—were unrealistic, and that the department needed more staff. (Compl. ¶¶ 45–46.)

---

[3] AmSECT is a professional association that supports the educational and professional needs of perfusionists in the practice of extracorporeal circulation technology. (AmSECT, About Us, https://amsect.org/about/about-us (last visited Dec. 12, 2025).) AmSECT has published Standards and Guidelines for Perfusion Practice. (Compl. ¶ 23.) According to AmSECT, these guidelines "were created as a checklist or template to ensure departments follow what is expected of a perfusion team by its national society" but are "**not** mandatory." (AmSECT, Standards and Guidelines, available at https://amsect.org/policy-practice/amsects-standards-and-guidelines (last visited Dec. 12, 2025) (emphasis added).)

2

While Neugebauer did not hire a second full-time perfusionist at that time, he utilized the assistance of PRN perfusionists (perfusionists who are not regularly scheduled, but pick up shifts, as needed). (*Id.* ¶¶ 40, 42.) The PRNs covered shifts outside of Plaintiff's regular hours and Plaintiff's time off. (*Id.* ¶¶ 43, 60.) Because PRNs are in high demand and are only used on an "as needed" basis (i.e., they are not full-time employees) they earn a high hourly wage—more than Plaintiff earned. (*Id.* ¶¶ 33, 42.)

Plaintiff asked Neugebauer to compensate her on-call time at the same rate as PRNs. (*Id.* ¶ 49.) Neugebauer did not. (*Id.* ¶ 51.)

## II.     September–December 2024: Plaintiff Complains about Staffing and Scheduling Issues.

Plaintiff alleges that Neugebauer began "harassing and discriminating" against her after she notified him of the need for a second perfusionist under AmSECT guidelines. (*Id.* ¶ 48.) On September 30, 2024, Plaintiff emailed Human Resources ("HR") to report "discrimination." (Compl. ¶ 52; *see* Exhibit A.[4]) Plaintiff reported that Neugebauer: (1) had not hired a second full-time perfusionist; (2) unfairly compared Plaintiff to his daughter, Corie Bellefeuille, a PRN; and (3) ignored her requests for additional compensation and scheduling changes. (Exhibit A.) Plaintiff claimed Neugebauer's actions created a "hostile work environment" and "appear[ed] to be motivated by gender, race, and national origin." (*Id.*) Plaintiff offered no explanation for how she connected this alleged treatment to any protected class and made no allegation of sexual harassment. (*See id.*) HR

---

[4] Exhibit A is incorporated by reference by Plaintiff's Complaint ¶ 52.

investigated, and on October 16, 2024, notified Plaintiff that her complaints of discrimination and hostile work environment were unsubstantiated. (Compl. ¶ 54.)

Notwithstanding, Neugebauer agreed to provide Plaintiff with additional on-call pay through June 2025, when a second perfusionist was scheduled to start. (*Id.* ¶ 55.) For the first 15 call shifts Plaintiff worked in a month, she would be paid at her normal rate. (*Id.*) If Plaintiff worked more than 15 call shifts in a month, she would earn $150 extra per call shift starting on day 16. (*Id.*)

Thereafter, Plaintiff no longer complained that she had to <u>work too much</u>, but rather that she was <u>not working enough</u>. (*Id.* ¶ 64.) On December 18, 2024, Plaintiff reported to HR that Neugebauer was not scheduling her for 15+ call days to avoid paying her the extra call pay. (*Id.* ¶ 64; *see* <u>Exhibit B</u>.[5]) Plaintiff felt this was "unfair." (*See* <u>Exhibit B</u>.)

### III.   December 30, 2024: Bellefeuille Complains about Plaintiff.

After working as a PRN alongside Plaintiff for several months, Bellefeuille had concerns. (*See* Compl. ¶ 66.) Bellefeuille believed that Plaintiff was using expired equipment on patients, was failing to keep the storeroom stocked with unexpired items, and was not present or on site during her scheduled shift because she would leave when she was not in an active case. (*Id.* ¶¶ 72–73.) On December 30, 2024, Bellefeuille reported these concerns, and others, to HR. (*Id.*)

---

[5] Exhibit B is incorporated by reference by Plaintiff's Complaint ¶ 64.

### IV.    January 20, 2025: Plaintiff Asks Human Resources to Reopen Investigation into Neugebauer.

Immediately upon learning that Bellefeuille had made a report against her, on January 20, 2025, Plaintiff asked HR to reopen its investigation into "unfair treatment" by Neugebauer. (*Id.* ¶¶ 73–76; Exhibit C.[6]) Specifically, Plaintiff complained that Neugebauer: (1) reduced her call pay, (2) did not include her in hiring and scheduling decisions, (3) entered her PTO without notifying her, and (4) overpaid Bellefeuille. (*See* Exhibit C.) Plaintiff also complained that Bellefeuille was making false allegations against her. (*See id.*; *see also* Compl. ¶ 73.)

HR investigated Plaintiff's January 20, 2025, complaints and, on February 14, 2025, notified Plaintiff that the investigation was complete. (Compl. ¶ 77.)

### V.    February 20, 2025–May 16, 2025: Plaintiff Receives Performance Improvement Plan and Neugebauer Allegedly Makes Inappropriate Racial and Sexual Comments.

On February 20, 2025, Neugebauer placed Plaintiff on a Performance Improvement Plan ("PIP") because her "performance had fallen below expected levels." (*Id.* ¶ 79; Exhibit D.[7]) The PIP noted several compliance and performance concerns that mirrored the concerns raised by Bellefeuille, including, but not limited to, Plaintiff's failure to properly label and set aside expired products; her failure to utilize a scavenging line when patients were under anesthesia to collect inhalation agents, compromising patient and employee

---

[6] Exhibit C is incorporated by reference by Plaintiff's Complaint ¶ 76.

[7] Exhibit D is incorporated by reference by Plaintiff's Complaint ¶ 79.

safety; and her failure to be present at work at all times during her scheduled shifts. (Compl. ¶¶ 80, 81; Exhibit D.)

With respect to her attendance, Plaintiff admits that she was not present from 7:00 a.m. to 3:30 p.m. during the workday but would instead report to the hospital for cases only when scheduled. (*Id.* ¶¶ 120–27.) To combat this, the PIP required that Plaintiff check in with Neugebauer at the beginning and the end of each of her shifts. (*Id.* ¶ 128.)

In her Complaint, Plaintiff alleges that from February 28, 2025, to May 16, 2025, Neugebauer made inappropriate sexual and racial comments to her during these check ins. (*Id.* ¶¶ 129–35.) Plaintiff does not allege she reported these incidents (or any other incidents) to HR at any time from February 28, 2025, to May 16, 2025. (*See id.*)

## VI.   May 16, 2025: After Being Confronted about Absences during the Workday, Plaintiff Discloses She Is Breastfeeding at Work.

On May 16, 2025, Neugebauer and HR met with Plaintiff to follow up on the PIP. (*Id.* ¶ 136.) During the meeting, Neugebauer reiterated that no one could find Plaintiff between surgeries and questioned why there were still expired items in the supply room— issues that had specifically been raised in the PIP. (*Id.*; *see also* Exhibit D.) In response, Plaintiff disclosed for the first time that she was expressing breastmilk in the bathroom. (Compl. ¶ 141.) While Neugebauer allegedly expressed "disbelief," was "dismissive[]," and "did not like the fact" that Plaintiff was pumping at work, Plaintiff alleges she was able to pump at work and bottle feed her child. (*Id.* ¶¶ 19, 142, 144.)

**VII.    May 20–28, 2025: After Being Confronted with Performance Issues, Plaintiff Makes Complaints to Human Resources.**

After being confronted with continuing performance issues on Friday, May 16, 2025, Plaintiff made a complaint to Human Resources on Tuesday, May 20, 2025. (*Id.* ¶ 144; *see* <u>Exhibit E</u>.[8]) In her May 20, 2025, email complaint, Plaintiff complained that her PIP was impossible to achieve, that she was wrongly accused of performance concerns, and that she was subjected to "disbelief and dismissiveness" when she explained she was expressing breastmilk during the workday. (*Id.* ¶ 144.) With respect to her check ins with Neugebauer, Plaintiff said only: "[t]hese encounters have been uncomfortable and, at times, hostile. During these check-ins, he has made bullying remarks and, on multiple occasions, used racial slurs directed at me." (*Id*; <u>Exhibit E.</u>) She provided no examples of "racial slurs" or "bullying remarks," provided no additional details, and made no reference to sexual harassment. (*See id.*)

On May 28, 2025, Plaintiff emailed HR that "as a Black female she felt unsafe during her morning check-ins with Neugebauer and requested that the check-ins be stopped." (Compl. ¶ 149.) In a follow-up email to HR that day, Plaintiff complained that the daily check-ins and check-outs were "hurtful" and "require[ed] the victim to return to the abuser on a daily basis." (*Id.* ¶ 150; <u>Exhibit F.</u>[9]) Again, Plaintiff provided no details. (*See* <u>Exhibit F.</u>) Ultimately, when HR attempted to meet with Plaintiff to discuss her concerns and learn more about her allegations after both her May 20 and May 28

---

[8] Exhibit E is incorporated by reference by Plaintiff's Complaint ¶ 144.

[9] Exhibit F is incorporated by reference by Plaintiff's Complaint ¶ 150.

complaints, Plaintiff refused to participate in Essentia's investigation. (*See id*.) Plaintiff does not allege she made any other complaints thereafter. (*Id.*)

### VIII.  June 2025: Essentia Terminates Plaintiff's Employment.

On June 4, 2025, Essentia terminated Plaintiff's employment for failing to meet performance expectations. (Compl. ¶¶ 153, 156; <u>Exhibit G</u>.[10]) This lawsuit followed.

### LEGAL STANDARD

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), Plaintiff must make sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible when the plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (citing Fed. R. Civ. P. 8(a)(2)). Thus, a complaint must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

When considering a motion to dismiss under Rule 12(b)(6), "the court generally must ignore materials outside the pleadings, but it may consider 'some materials that are part of the public record or do not contradict the complaint, as well as materials that are 'necessarily embraced by the pleadings.'" *Porous Media Corp.*, 186 F.3d at 1079 (quoting

---

[10] Exhibit G is incorporated by reference by Plaintiff's Complaint ¶ 156.

*Missouri ex rel. Nixon v. Coeur D'Alene Tribe*, 164 F.3d 1102, 1107 (8th Cir. 1999); *Piper Jaffray Cos. v. Nat'l Union Fire Ins. Co.*, 967 F. Supp. 1148, 1152 (D. Minn. 1997)). "[W]here a plaintiff chooses not to attach to the complaint, or incorporate by reference, a document upon which it relies, and is integral to the complaint, the defendant may produce such document in support of a motion to dismiss. *Brogren v. Pohlad*, 933 F. Supp. 793, 798 (D. Minn. 1995) (internal citations omitted). In deciding a Rule 12 motion, the court can consider a document upon which the complaint is based, without treating the motion as a Rule 56 motion, because "a plaintiff who pleads misrepresentations in a particular document ought not be permitted to defeat a motion to dismiss through the artifice of not attaching the critical document to the complaint." *Id.*

## ARGUMENT

Plaintiff has failed to state a plausible claim for relief with respect to her claims for retaliation in violation of N.D.C.C. § 34-01-20 (Count I); discrimination in violation of N.D.C.C. § 14-02.4-03 (Count II); sexual harassment/hostile work environment in violation of N.D.C.C. § 14-02.4-03 (Count III); sex discrimination in violation of N.D.C.C. § 14-02.4-03(2) (Count IV); negligent hiring, supervision and retention (Count VI); wrongful termination in violation of public policy (Count VII); and intentional infliction of emotional distress (Count VIII), and these counts must be dismissed pursuant to Rule 12.[11]

---

[11] Essentia does not move to dismiss Count V of Plaintiff's Complaint at this time, but denies any wrongdoing and liability and reserves its right to assert affirmative defenses.

## I.   Choice of Law.

This case involves parties from the state of North Dakota and Minnesota. Because the case sits in diversity, Minnesota's choice-of-law rules apply. *Est. of Hopfinger ex rel. Hopfinger v. U.S. Bank Nat'l Ass'n*, 768 F. Supp. 3d 977, 985 (D. Minn. 2025). The first step in the analysis is to determine whether a conflict exists between the laws of the two states. *Id.* If a conflict exists, the next step is to analyze the "choice influencing factors" to determine which law to apply, including (1) predictability of result; (2) maintenance of interstate and international order; (3) simplification of judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law. *Id.* at 986. Ultimately, the Court "must ensure that each state has significant contacts with the case so that its laws can be constitutionally applied." *Id.*

Here, Counts I, II, III, IV, and VII of Plaintiff's Complaint are pled under North Dakota law, and should be analyzed accordingly. Counts VI (negligence) and VIII (intentional infliction of emotional distress) of Plaintiff's Complaint are pled under common law. Fundamentally, as demonstrated below, there is no conflict between North Dakota and Minnesota laws with respect to these claims. But if there were, Minnesota choice of law rules would support the application of North Dakota law. Plaintiff is a resident of the state of North Dakota, worked in the state of North Dakota, and her claims arise out of events that she alleges occurred in North Dakota. North Dakota has the significant contacts with this case, and the application of its law is the better application.

## II.     Plaintiff's Retaliation Claim (Count I) Fails.

In Count I, Plaintiff alleges that she suffered retaliation in violation of N.D.C.C. § 34-01-20 "for reporting to Neugebauer that Essentia was in violation of AmSECT's Guidelines by not having a second perfusionist three out of four weeks a month." (Compl. ¶ 176.)

Section 34-01-20 is a whistleblowing statute that protects employees who report "a violation or suspected violation of federal, state, or local law, ordinance, regulation, or rule to an employer, a governmental body, or a law enforcement official" from retaliation by their employers. N.D.C.C. § 34-01-20; *see also Ramirez v. Walmart*, 915 N.W.2d 674, 676 (N.D. 2018). To establish a prima facie case for retaliatory discharge, the employee must show: "(1) the employee engaged in protected activity; (2) the employer took adverse action against the employee; and (3) the existence of a causal connection between the employee's protected activity and the employer's adverse action." *Dahlberg v. Lutheran Soc. Servs. of N.D.*, 625 N.W.2d 241, 253 (N.D. 2001). "Section 34-01-20, N.D.C.C., prohibits an employer from discharging an employee for reporting illegalities," *Jacob v. Nodak Mut. Ins. Co.*, 693 N.W.2d 604, 611 (N.D. 2005), and was not "intended to protect an employee who acts for a purpose other than exposing an illegality." *Dahlberg*, 625 N.W.2d at 254–55. "It is well-established that the matters complained must be **unlawful**, if true, to be protected by the whistleblower statute." *Auer v. City of Minot*, 2017 WL 5894999, at *10 (D.N.D. Feb. 8, 2017) (citing *Mosley v. Alpha Oil & Gas Servs., Inc.*, 962 F. Supp. 2d 1090, 1097 n.6 (D.N.D. 2013)) (emphasis added).

11

Here, Plaintiff's Section 34-01-20 retaliation claim fails because her concerns regarding compliance with AmSECT's Guidelines do not amount to unlawful conduct. (Compl. ¶¶ 173, 176.) The AmSECT Guidelines are <u>non-mandatory industry guidelines,</u> **not** <u>legal requirements.</u> (*See* AmSECT, Standards and Guidelines, https://amsect.org/policy-practice/amsects-standards-and-guidelines (last visited Dec. 12, 2025).) Any "violation" of a non-mandatory industry guideline is not a legal violation, is not unlawful as a matter of law, and cannot form the basis of a claim under Section 34-01-20. *See Ramirez*, 915 N.W.2d at 676–77 (dismissing Section 34-01-20 claim under Rule 12(b)(6) where Plaintiff failed to "identify any law or regulation allegedly violated" by his employer).

Accordingly, Plaintiff's Section 34-01-20 retaliation claim fails, and Count I must be dismissed.

### III.    Plaintiff's Discrimination Claim (Count II) Fails.

In Count II, Plaintiff alleges that she experienced discrimination when she was treated differently than unnamed "non-minority employees" in "job assignments, income opportunities, evaluations, and disciplinary action" in violation of the North Dakota Human Rights Act ("NDHRA"). (Compl. ¶ 180.)

To establish a prima facie claim of discriminatory discharge under the NDHRA, Plaintiff must show: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. *E.E.O.C. v. Cudd Energy Servs.*, 2016 WL 11494742, at *10 (D.N.D. Oct. 11, 2016). "An adverse

12

employment action is exhibited by a material employment disadvantage, such as a change in salary, benefits, or responsibilities." *Chase v. Ashcroft*, 2004 WL 2238793, at *13 (D.N.D. Sept. 29, 2004) (internal citations and quotations omitted). "Termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects meet this standard." *Id.* (citing *Duncan v. Delta Consol. Indus., Inc.*, 371 F.3d 1020, 1026 (8th Cir. 2004), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031, 1043, 1059 (8th Cir. 2011)).

"In a prima facie case, the plaintiff 'must identify and relate specific instances where persons situated similarly in all relevant aspects were treated differently.'" *Miller v. Medcenter One*, 571 N.W.2d 358, 362 (N.D. 1997) (quoting *Molloy v. Blanchard*, 115 F.3d 86, 91 (1st Cir.1997)); *but see Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 852 (8th Cir. 2005) (stating that the proper standard for "similarly situated" employes at the prima facie case stage is whether employees were "involved in or accused of the same or similar conduct and [were] disciplined in different ways"). Here, the Complaint makes plain that the only person "similarly situated" to Plaintiff was Moser, prior to his death in June of 2024. (Compl. ¶ 30.) Following his death, Plaintiff was the only perfusionist on her team. (*Id.* ¶¶ 30, 31, 35, 49, 55, 97, 166.)

Job Assignments. Plaintiff identifies no "job assignment" that constitutes an adverse employment action for which she was treated less favorably than a non-minority employee. (Compl. ¶ 180.) Plaintiff herself alleges that she was *promoted* to the Chief Perfusionist role—the most senior role on her team. (*Id.* ¶ 33.)

13

At most, Plaintiff alleges that her position changed to include being a "scout nurse" in May of 2025—an assignment she appears to view unfavorably, though she does not allege that it was an "adverse employment action" as a matter of law. (*Id.* ¶ 145); *Chase*, 2004 WL 2238793, at \*13. But even if it were, Plaintiff does not—and cannot—make any allegations regarding the work assignments of any other non-minority perfusionists and whether they, too, were assigned a scout nurse role, because Plaintiff was the only perfusionist employed by Essentia at the time. Indeed, the Complaint makes no mention of whether Moser—the only other potential comparator from the Complaint—was ever assigned scout nurse duties before he died. There is nothing in the Complaint from which a trier of fact could plausibly draw an inference of discrimination with respect to this (or any other) "job assignment," and Plaintiff's discrimination claim fails in this regard.

Income Opportunities. Plaintiff next alleges discrimination in "income opportunities." (Compl. ¶ 180.) But Plaintiff makes no mention of Moser's pay, as the only other employee perfusionist, or how it compared to hers before his death.

Instead, Plaintiff complains of her hourly on-call pay relative to Essentia's contract workers—PRNs, who, as as-needed contractors, are paid a different hourly rate from Essentia's full-time employees. (*Id.* ¶¶ 33, 42.) Plaintiff understands that there is a difference between employees and PRN staff, as evidenced by her own words: "I am working alone. The expectation for PRN staff is to provide support until our full-time team starts. . . . [they] only sign up for what [they] can reasonably manage." (*Id.* ¶ 109.) Indeed, contractors are not similarly situated to full-time employees for purposes of compensation, and their pay model cannot be used to form the basis of a discrimination complaint. *Miller*,

14

571 N.W.2d at 362; *see also Moore v. Shands Jacksonville Med. Ctr., Inc.*, 2013 WL 12178163 at *7 (M.D. Fla. Oct. 18, 2013) (finding PRN contractors are not "similarly situated" to full time employees) (citing *Ahern v. Shinseki*, 2009 WL 1615402, at *2 (D.R.I. June 9, 2009) (the plaintiffs, full time employees with benefits, were not similarly situated to the alleged contractors, temporary contract workers without benefits); *Kulik v. Med. Imaging Res., Inc.*, 2008 WL 2415360, at *4 (E.D. Mich. June 12, 2008) (plaintiff, a permanent employee with benefits, was not similarly situated to a "full time temporary" employee with no benefits)). Plaintiff cannot base a discrimination complaint on the fact that her hourly rate for on-call cases differed from contract workers to whom she is not similarly situated.

Beyond that, Plaintiff alleges that Neugebauer discriminated against her in terms of pay when he kept her on-call shifts under 15 per month to avoid having to pay her an increased on-call rate. (Compl. ¶¶ 48–59.) Nothing in the Complaint suggests that Neugebauer made this decision based on any of Plaintiff's protected class characteristics, or that he treated any non-minority employee any differently. Indeed, Plaintiff's Complaint establishes only the following: (1) Plaintiff complained to HR that her "workload ha[d] become a lot" and she required additional staff support and/or more pay to ensure she could remain "fresh for a procedure" (*id.* ¶¶ 50, 52); (2) Neugebauer retained the services of PRN staff and arranged for Plaintiff to receive additional compensation in months where she worked more than 15 on-call days—a special compensation arrangement Plaintiff does not allege Neugebauer made for anyone else (*id.* ¶ 55); and (3) Neugebauer attempted to keep Plaintiff's call days below 15 per month (*id.* ¶ 56). Plaintiff's Complaint is completely

15

devoid of any allegations—and certainly devoid of a similarly-situated comparator—to plausibly maintain that this action creates an inference of discrimination based on any of Plaintiff's protected class characteristics.

Evaluations. Next, Plaintiff alleges she was discriminated against in "evaluations." (*Id.* ¶ 180.) But Plaintiff does not so much as plead that she ever received an evaluation, much less that it constituted an adverse employment action or that it differed in any way from the evaluations received by any non-minority employees.

Disciplinary Action. Finally, Plaintiff alleges she was discriminated against in "disciplinary action." (*Id.* ¶ 180.) Plaintiff alleges two forms of disciplinary action: her PIP and the termination of her employment. (*Id.* ¶ 198.) Plaintiff's PIP is not an adverse employment action and cannot form the basis for a discrimination claim. *Givens v. Cingular Wireless*, 396 F.3d 998, 998 (8th Cir. 2005) (stating that placing employee on performance improvement plan, without more, does not constitute an adverse employment action).

With respect to the termination of her employment, Plaintiff does not so much as allege that it was based on any protected class status, that an inference of discrimination exists, or that any similarly-situated non-minority employee received more favorable treatment. (Compl. ¶¶ 151–73.) To the contrary, Plaintiff alleges only that her reasons for termination were false, and that she believes her termination was in retaliation for raising complaints. (*Id.*; *see also id.* ¶ 173 ("After raising her concerns about compliance with AmSECT Guidelines and being discriminated and harassed, [Plaintiff] was retaliated against by: . . . being terminated."). This, too, is fatal to her discrimination claim.

Because Plaintiff has not alleged facts sufficient to support a prima facie case that she was treated less favorably than any "non-minority employee" with respect to "job assignments, income opportunities, evaluations, [or] disciplinary action," Count II must be dismissed.

## IV.   Plaintiff's Sexual Harassment/Hostile Work Environment Claim (Count III) Fails.

In Count III, Plaintiff alleges that she experienced sexual harassment in violation of Section 14-02.4-03, which prohibits discrimination on the basis of sex, including sexual harassment. N.D.C.C. § 14-02.4-03. *See also id.* § 14-02.4-02 (defining "sex" under Section 14-02.4-03).

To establish a prima facie claim of hostile work environment based on sexual harassment under North Dakota law, a plaintiff must show: (1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take proper remedial action. *Hysjulien v. Hill Top Home of Comfort, Inc.*, 827 N.W.2d 533, 544 (N.D. 2013).

Here, Plaintiff acknowledges that Essentia can only be held liable for the alleged sexual harassment under North Dakota law "if it kn[ew] or should [have] know[n] of the existence of the harassment and fail[ed] to take timely and appropriate action." (Compl. ¶ 186.) However, Plaintiff does not plead any facts showing that she ever reported sexual harassment to Essentia.

17

Indeed, despite pleading now a long, dated list of alleged harassing encounters between February and May of 2025 (*see id.* ¶ 135), Plaintiff makes no allegation that she reported this conduct contemporaneously at any time. (*Id.*). When Plaintiff emailed HR on May 20, 2025 (four days following the last-listed encounter), she made no mention of sexual harassment whatsoever, referencing only "bullying remarks," "abusive behavior," and "racial slurs." (*Id.* ¶ 144.) When she emailed HR again on May 28, 2025, she referenced only being a "victim" required to "return to the abuser," but again made no reference to experiencing sexual harassment. (*Id.* ¶ 148.) Plaintiff then refused to participate in any internal investigation. (*See id.* ¶ 150; Exhibit F (Plaintiff's May 28, 2025, email to HR explaining the basis for her refusal to meet and reiterating it)). Her employment ended without any additional complaints made. (*See* Compl. ¶¶ 150–53.)

Against this backdrop, Plaintiff fails to offer a single fact to establish that Essentia "knew or should have known of the [sexual] harassment and failed to take proper remedial action." *Hysjulien*, 827 N.W.2d at 544. Plaintiff simply never reported it. (Compl. ¶¶ 52, 64, 144, 150; *see also* Exhibits A–F.) This is fatal to a claim for sexual harassment. *See Sandoval v. Am. Bldg. Maint. Indus., Inc.*, 765 F. Supp. 2d 1138, 1176 (D. Minn. 2010) (dismissing hostile work environment claim on summary judgment where there was no evidence that the plaintiff's sexual harassment was ever reported to management or that there was an open and pervasive environment of harassment at the plaintiff's worksite).

For this reason, Plaintiff's sexual harassment claim fails, and Count III must be dismissed.

18

**V.    Plaintiff's Sex Discrimination in Violation of N.D.C.C. § 14-02.4-03(2) Claim (Count IV) Fails.**

In Count IV, Plaintiff makes a claim for "sex discrimination (nursing mother)" under N.D.C.C. § 14-02.4-03(2). Specifically, Plaintiff claims that she was a "nursing mother" and "Essentia discriminated against her on the basis of her sex by interfering with her right to have reasonable break times to express milk." (Compl. ¶¶ 193–94.)

Under Section 14-02.4-03(2), it is "a discriminatory practice for an employer to fail or refuse to make reasonable accommodations for an otherwise qualified individual . . . because that individual is pregnant." N.D.C.C. § 14-02.4-03(2). In 2023, Section 14-02.4-03(2) was amended to clarify the definition of "pregnant," and now states: "[f]or purposes of this subsection, 'pregnant' includes pregnancy, childbirth, and related medical conditions." *Id.*; *see also* 2023 N.D. Sess. L. ch. 142. Notably, the legislature did <u>not</u> include the terms "breastfeeding," "lactation," or the like when defining the term "pregnant." *See* N.D.C.C. § 14-02.4-03(2).

By the plain terms of the statute, Section 14-02.4-03(2) covers conditions related to "pregnancy" and "childbirth"—not breastfeeding. Indeed, no court has interpreted the language in Section 14-02.4-03(2) to cover breastfeeding, and courts interpreting identical language in other state statutes and the federal Pregnant Workers Fairness Act ("PWFA")—upon which Section 14-02.4-03(2) is modeled—have held that breastfeeding is not included. *Spagnolia v. Charter Commc'ns, LLC*, 2023 WL 3317781 at *11 (D. Colo. May 5, 2023) ("The Court also notes that neither the plain language of the PWFA nor its legislative history make any mention of lactation or breastfeeding. The Court finds these omissions are significant because legislative bodies other than Colorado have expressly

included lactation or breastfeeding in such acts when that was their intent") (citing statutes); *See* 42 U.S.C. § 2000gg(4)[12] ("the term 'known limitation' means physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions"); Lobbyist Declaration by North Dakota Catholic Conference, *House Bill 1450 – Pregnant Workers Protection* (Mar. 8, 2023), available at https://ndlegis.gov/ assembly/68-2023/testimony/SINBUS-1450-20230308-22734-F-DODSON_CHRISTOP HER.pdf (last visited Dec. 12, 2025) (lobbyist letter considered by North Dakota legislature prior to 2023 amendment to Section 14-02.4-03(2), urging the legislature to amend the definition of "pregnant" consistent with the PWFA to cover childbirth and related conditions, such as miscarriages). Because Section 14-02.4-03(2) does not protect breastfeeding, Count IV should be dismissed.

But even if Section 14-02.4-03(2) did cover breastfeeding (it does not), Plaintiff fails to plead facts indicating that Essentia failed or refused to make reasonable accommodations for her. To the contrary, Plaintiff does not allege that she ever made a reasonable request for breaks to breastfeed. (*See* Compl.) Nor does she allege she was ever prohibited from doing so. (*Id*. ¶ 19.)

At most, Plaintiff alleges that when Neugebauer questioned where she went between procedures and she disclosed for the first time that she was breastfeeding, Neugebauer expressed "disbelief," was "dismissive[]," and "did not like the fact [that she] was going to the bathroom to pump breast milk where he could not find her." (*Id.* ¶¶ 141–42, 144.)

---

[12] Separate from the PWFA, Congress provides workplace breastfeeding protections through the PUMP Act, 29 U.S.C. § 218d.

Even if true, it does not establish Neugebauer ever <u>interfered with</u> her right to express breast milk at work.

Because Section 14-02.4-03(2) does not cover breastfeeding and because Plaintiff pleads no facts showing that Essentia failed or refused to accommodate her desire to nurse, Count IV fails and must be dismissed.

> **VI.    Plaintiff Cannot Maintain a Claim of Negligent Hiring, Supervision, or Retention (Count VI).**

In Count VI, Plaintiff alleges that Essentia negligently hired, supervised, and retained Neugebauer.

To establish a claim of negligent **hiring**, a plaintiff must show her employer had either actual or constructive knowledge that the person hired was incompetent, unfit, or posed a risk to others at the time of hire. *Schlenk v. Nw. Bell Tel. Co.*, 329 N.W.2d 605, 614 (N.D. 1983). Plaintiff offers no facts to support that Essentia knew or should have known Neugebauer was incompetent, unfit, or posed a risk to others at the time of hire. This is fatal to any claim for negligent hiring.

To establish a claim of negligent **supervision or retention**, a plaintiff must show that the employer failed to exercise ordinary care in supervising or retaining an employee to prevent reasonably foreseeable harm. *Koehler v. County of Grand Forks*, 658 N.W.2d 741, 749 (N.D. 2003); *Richard v. Washburn Pub. Sch.*, 809 N.W.2d 288, 297 (N.D. 2011). "Imposition of a duty is limited to those instances where a reasonably foreseeable victim is injured by a reasonably foreseeable harm." *Richard*, 809 N.W.2d at 297. Harm is "reasonably foreseeable," when, for example, an employee is "in the habit of misconducting themselves in a manner dangerous to others." *Id.* (citations omitted).

However, there can be no "independent claim for negligent supervision in an employment case where the injury suffered by the plaintiff employee is the loss of employment—at least absent a physical injury." *Kongelf v. Sears Holding Corp.*, 2010 WL 1977955, at *4-5 (D.N.D. Apr. 12, 2010) (citing *St. Hilaire v. Minco Prods., Inc.*, 288 F. Supp. 2d 999, 1009–10 (D. Minn. 2003) ("To maintain an action for either negligent retention or negligent supervision, the existence of a threat, or reasonable apprehension of actual physical injury is required.")). Such negligence claims without physical injury are foreclosed by the employment at-will doctrine codified at N.D.C.C. § 34-03-01. *Id.* at *3. Here, because Plaintiff has not alleged a physical injury, her independent cause of action for negligent supervision and retention fails as a matter of law.

But even if it were otherwise, Plaintiff's claim fails for the additional reason that nothing in the Complaint establishes that Neugebauer's actions amounted to "reasonably foreseeable harm" that Essentia had a duty to prevent. There is nothing in the Complaint to plausibly suggest that Neugebauer had ever engaged in this misconduct before, that anyone else had experienced his misconduct, or that anyone else knew about it. *See* Compl. The allegations in the Complaint establish only that Plaintiff alone experienced an event and she never reported her concerns to Essentia at any time. *See supra* Section IV. Plaintiff fails to plead that it was "reasonably foreseeable" that Neugebauer "posed a risk of engaging in sexually inappropriate conduct" that Essentia had a duty to prevent, and her negligence claims fail on that basis, too. (Compl. ¶ 202 (emphasis added).)

Count VI fails and must be dismissed.

22

### VII.   Plaintiff's Wrongful Termination in Violation of Public Policy Claim (Count VII) Fails.

In Count VII, Plaintiff alleges that she experienced a wrongful termination in violation of North Dakota's public policy after reporting a failure to follow AmSECT guidelines and after asserting her rights under anti-discrimination laws. (*Id.* ¶¶ 206–07.)

To present a claim for wrongful discharge, Plaintiff must "specify the legal provision violated by the employe[r]," it must be clear "from the face of the [complaint] that the legal provision in question involves a clear mandate of public policy," and the complaint must "demonstrate that the public policy mandated by the cited provision is violated by the discharge." *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 855 (8th Cir. 2012) (internal citations and quotations omitted). "[A] wrongful discharge action must be based on a constitutional provision, statute, regulation, or rule promulgated by a governmental body." *Id.*; *Jose v. Norwest Bank N.D., N.A.*, 599 N.W.2d 293, 298 (N.D. 1999) ("public policy must be evidenced by a constitutional or statutory provision"). "Absent such explicit authority, the wrongful discharge action fails as a matter of law." *Richter*, 686 F.3d at 856 (internal citations and quotations omitted); *see also Jose*, 599 N.W.2d at 298 (affirming dismissal of wrongful discharge claim on summary judgment where plaintiff alleged that he was terminated in retaliation for participating in an internal employee investigation but pointed to no constitutional or statutory provision prohibiting retaliation in such circumstances); *Lee v. Walstad*, 368 N.W.2d 542, 547 (N.D. 1985) (declining to recognize public policy exception to at-will employment where claimant "defined no clear public policy which his removal violate[d]").

23

Here, with respect to her staffing concerns under AmSECT guidelines, Plaintiff fails to specify any "constitutional provision, [] statute, [] regulation based on a statute or [] rule promulgated by a governmental body." The non-mandatory guidelines of a professional association like AmSECT are not the law and do not fall within this scope. *Richter*, 686 F.3d at 855-56.

Further, Plaintiff alleges that the termination of her employment "for asserting [her] rights under anti-discrimination laws violates North Dakota's clear public policy." (Compl. ¶ 207.) But North Dakota courts have long held that "the presence of a statutory remedy for a violation of an anti-discrimination statute precludes a common law action based on violation of a public policy against discrimination." *Bakken v. N. Am. Coal Corp.*, 641 F. Supp. 1015, 1023 (D.N.D. 1986). Here, the NDHRA contains a remedy for retaliation under anti-discrimination laws (which Plaintiff herself seeks through Count V), and the parallel public policy claim is precluded.

For these reasons, Count VII must be dismissed.

### VIII. Plaintiff's Claim for Intentional Infliction of Emotional Distress (Count VIII) Fails.

Finally, Plaintiff alleges that Essentia's "conduct in violating the North Dakota Human Rights Act with respect to discrimination on the basis of race, gender, sex and/or national origin, sexual harassment, and retaliation" was "extreme and outrageous" and caused severe emotional distress. (Compl. 36 ¶¶ 55–59.[13])

---

[13] Plaintiff restarted paragraph numbering at 56 on page 36 of her Complaint.

Under North Dakota law, a claim for intentional infliction of emotional distress ("IIED") requires proof of (1) extreme and outrageous conduct that is (2) intentional or reckless and that (3) causes severe emotional distress. *Hysjulien*, 827 N.W.2d at 549. "The 'extreme or outrageous' threshold is narrowly limited to conduct that exceeds 'all possible bounds of decency' and which would arouse resentment against the actor and lead to an exclamation of 'outrageous' by an average member of the community." *Id.* (citation omitted.) This standard is "strenuously high," and the question of whether it is met is a question of law. *Id.*

Plaintiff's IIED claim fails for at least two reasons: (1) the conduct she complains of largely does not meet the "strenuously high" standard set forth under North Dakota law; and (2) she has pled no theory of vicarious liability for the alleged comments made by Neugebauer.

### A.    Essentia's Alleged Conduct is Not Extreme or Outrageous.

The conduct Plaintiff alleges Essentia engaged in can best be described as daily workplace trials and tribulations—disagreements with PRN staff, disagreements regarding scheduling and pay, performance management concerns, a PIP, the termination of her employment, and the like. While these daily workplace experiences may "certainly cause[] stress and mental anguish in [a] person . . . it is not conduct that is so extreme and outrageous that it goes beyond all possible bounds of decency." *Krause v. Bobcat Co.*, 297 F. Supp. 2d 1212, 1219 (D.N.D. 2003) (holding that employment termination cannot form the basis for an IIED claim); *see also Dahlberg*, 625 N.W.2d at 249 (stating that because any termination "produces stress and mental anguish . . . the test is not whether or not the

termination was traumatic, but whether or not the termination was outrageous"); *Sadler v. Basin Elec. Power Coop.*, 409 N.W.2d 87, 90 (N.D. 1987) (employer's termination of employee did not provide grounds for employee's cause of action for intentional infliction of emotional distress); *Onyiah v. St. Cloud State Univ.*, 655 F. Supp. 2d 948, 971 (D. Minn. 2009) (stating "a work environment in which co-workers or supervisors criticize, taunt, or harass another employee, does not present the egregious conduct required for an IIED claim" nor do "negative comments concerning the Plaintiff's work performance," and dismissing plaintiff's IIED claim for failure to state a claim). *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 439–40 (Minn. 1983) (holding employer discipline and written and verbal criticism of employee's job performance are not extreme and outrageous). Plaintiff's IIED claim fails for this reason.

B.      There Is No Theory of Liability for Neugebauer's Alleged Comments.

Even if Plaintiff were to assert that the vulgar racial and sexual allegations by Neugebauer are extreme and outrageous, the Complaint itself makes plain that Essentia did not know about them. Essentia's conduct—receiving her reports and investigating them, despite Plaintiff's refusal to participate—is far from extreme and outrageous.

And Plaintiff pleads no theory by which Essentia is vicariously liable for Neugebauer's conduct. IIED is a tort claim. *G.K.T. v. T.L.T.*, 798 N.W.2d 872, 874-75 (N.D. 2011). "[A]n employer is [only] liable for the tortious acts of its employees committed while they are acting within the scope of employment[.]" *Van Klootwyk v. Baptist Home, Inc.*, 665 N.W.2d 679, 685 n.2 (N.D. 2003). "Scope of employment" means the employee "was acting on behalf of the [employer] in the performance of duties or tasks"

26

when engaged in the allegedly unlawful conduct. *Bolinske v. Sandstrom*, 978 N.W.2d 72, 78 (N.D. 2022). "[A]n act not taken in furtherance of the employer's business is not within the scope of employment." *Mentz v. U.S.*, 359 F. Supp. 2d 856, 860–61 (D.N.D. 2005).

Here, Plaintiff's Complaint contains no theory under which Essentia would be liable for the alleged conduct of Neugebauer—conduct that is squarely outside the scope of Neugebauer's employment. *See Nelson v. Gilette*, 571 N.W.2d 332, 336 n.1 (N.D. 1997) ("Actions of a state employee that constitute reckless or grossly negligent conduct, malfeasance, or willful or wanton misconduct are not within the scope of the employee's employment"); *see also Tashman v. Advance Auto Parts, Inc.*, 63 F.4th 1147, 1154–55 (8th Cir. 2023) (stating that employer is not liable under agency theory for IIED when the acts are not within the scope of employment and are forbidden). For this reason too, Plaintiff's IIED claim fails.

For all these reasons, Count VIII must be dismissed.

## CONCLUSION

For the foregoing reasons, Essentia respectfully requests that the Court dismiss Plaintiff's claims of retaliation in violation of N.D.C.C. § 34-01-20 (Count I); discrimination in violation of N.D.C.C. § 14-02.4-03 (Count II); sexual harassment/hostile work environment in violation of N.D.C.C. § 14-02.4-03 (Count III); sex discrimination in violation of N.D.C.C. § 14-02.4-03(2) (Count IV); negligent hiring, supervision and retention (Count VI); wrongful termination in violation of public policy (Count VII); and intentional infliction of emotional distress (Count VIII) in full.

27

**FAEGRE DRINKER BIDDLE & REATH LLP**

Dated: December 16, 2025

/s/ *Terran C. Chambers*
Terran C. Chambers, MN Atty #0396415
Hannah Camilleri Hughes, MN Atty # 0401726
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Telephone: (612) 766-7000
Facsimile: (612) 766-1600
Email: *terran.chambers@FaegreDrinker.com*
Email: *hannah.hughes@FaegreDrinker.com*

*Attorneys for Defendant Essentia Health*

DMS_US.374748044.10