UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Sylvia Rabo,

     Plaintiff,

v.

Essentia Health, *a non-profit Minnesota corporation*,

     Defendant.

File No. 25-cv-4407 (ECT/LIB)

**OPINION AND ORDER**

---

Karin Ryan and Charlie R. Alden, Gilbert Alden Barbosa PLLC, Burnsville, MN, for Plaintiff Sylvia Rabo.

Terran C. Chambers and Hannah Camilleri Hughes, Faegre Drinker Biddle & Reath LLP, Minneapolis, MN, for Defendant Essentia Health.

---

Sylvia Rabo worked as a cardiovascular perfusionist for Essentia Health in Fargo, North Dakota.  There, Rabo alleges, she suffered discrimination based on her race, national origin, and sex, including sexual harassment, all at the hands of her direct supervisor.

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Essentia has moved to dismiss four of the Amended Complaint's six counts.  The motion will be granted for the most part. (1) Fatal to her hostile-environment sexual-harassment claim under the North Dakota Human Rights Act, the Amended Complaint does not allege that Rabo reported sexual harassment to Essentia.  However, Rabo's claim that her Essentia employment was terminated for rejecting her supervisor's sexual advances in violation of the North Dakota Human Rights Act will not be dismissed.  (2) The negligent-supervision-or-retention claim

will be dismissed because the Amended Complaint does not plausibly allege that the harassing conduct of Rabo's supervisor was reasonably foreseeable to Essentia. (3) The claim that Rabo's termination violated public policy will be dismissed because the Amended Complaint does not tether the alleged public policy to a rule having the force of law. (4) And Rabo's claim for intentional infliction of emotional distress will be dismissed because the supervisor's harassment on which the claim depends was not plausibly within the supervisor's scope of employment.

I[1]

Rabo began working as a cardiovascular perfusionist (her formal title was "perfusionist – surgery") at Essentia-Fargo's Heart and Vascular Center in October 2023. Am. Compl. [ECF No. 12] ¶¶ 18–19.[2] When Rabo started at Essentia, Carl Moser was the

---

[1] In accordance with the standards governing Rule 12(b)(6) motions, the facts are drawn entirely from the operative Amended Complaint and documents embraced by it. *Glow In One Mini Golf, LLC v. Walz*, 37 F.4th 1365, 1370 (8th Cir. 2022). Relevant here, "materials embraced by the complaint include documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleadings." *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) (citation modified).

[2] According to the Mayo Clinic,

> Cardiovascular perfusionists are responsible for operating extracorporeal circulation equipment, such as the heart-lung machine, during an open-heart surgery or any other medical procedure in which it is necessary to artificially support or temporarily replace a patient's circulatory or respiratory function.
>
> Perfusion is the passage of bodily fluids, such as blood, through the circulatory or lymphatic system to an organ or tissue. Because the heart is mainly responsible for pumping

2

chief perfusionist and Rabo's direct supervisor. *Id.* ¶¶ 26, 31. Rabo and Moser were the only full-time perfusionists, and they typically split all perfusionist procedures evenly. *See id.* ¶¶ 21, 39, 43. Moser also supervised a "PRN[3] perfusionist" who worked at another hospital and traveled to Fargo to cover Rabo and Moser's vacations. *Id.* ¶¶ 31–33. Moser managed the perfusionists' schedules. *See id.* ¶¶ 31, 35–36.

On June 14, 2024, Moser died unexpectedly, and Duane Neugebauer, the cardiac department's supervisor, became Rabo's direct supervisor. *See id.* ¶ 42, 202. Following Moser's death, Rabo was the only full-time perfusionist on staff. *Id.* ¶ 43.

On June 25, 2024, Neugebauer offered Rabo the chief perfusionist position. *Id.* ¶ 44. After accepting that offer, Rabo went "from handling about 50% of the cases to handling all of the cases and potentially working 24/7." *Id.* ¶ 48. "Rabo notified Neugebauer they needed to hire a second perfusionist to comply with AmSECT's[4]

---

fluid through the body, when a patient has a procedure that interrupts the heart's normal function, a cardiovascular perfusionist steps in to temporarily do the heart's job. They monitor a patient's vitals and then select appropriate equipment and technique to manage normal blood flow, body temperature, and other respiratory functions.

*Cardiovascular Perfusionist*, Mayo Clinic Coll. of Med. & Sci., https://college.mayo.edu/academics/explore-health-care-careers/careers-a-z/cardiovascular-perfusionist (last visited June 11, 2026).

[3]   "PRN" is the medical abbreviation for the Latin phrase *pro re nata*, which means "as needed." *See pro re nata*, Merriam-Webster, https://www.merriam-webster.com/dictionary/pro%20re%20nata (last visited June 11, 2026); *see also* Am. Compl. ¶ 32.

[4]   AmSECT is the "American Society of ExtraCorporeal Technology," and it provides Standards and Guidelines for Perfusion Practice to be used "as a checklist or template to ensure departments follow what is expected of a perfusion team by its national society."

Guideline 15.1," *id.* ¶ 46, but Neugebauer refused, *id.* ¶¶ 53–54. Instead, Neugebauer hired PRN or locum[5] perfusionists to fill in for Rabo one week per month. *Id.* ¶¶ 55, 59. That left Rabo working "as the only perfusionist three out of four weeks per month," and during those three weeks, "she was either scheduled for a procedure or could be called at any time for a procedure 24/7." *Id.* ¶ 58. "Neugebauer finally agreed to also hire two other PRNs[,] but they only covered on-call shifts along with Rabo." *Id.* ¶ 60. The PRN perfusionists earned a higher hourly wage than Rabo. *See id.* ¶¶ 32, 44.

According to the Amended Complaint, "shortly after Rabo was made Chief Perfusionist, Neugebauer began harassing and discriminating against her." *Id.* ¶ 66. To support these legal characterizations of Neugebauer's conduct, the Amended Complaint alleges Neugebauer: (1) controlled scheduling, *id.* ¶ 67; (2) ignored Rabo's scheduling requests and prioritized requests of male PRNs, *id.* ¶ 68; (3) expected Rabo to handle all the cases three out of four weeks per month, called Rabo "lazy," and told her if he did not schedule her continuously, she would "lay around and do nothing," *id.* ¶ 69; (4) did not require white male perfusionists to handle all cases, *id.* ¶ 71; (5) paid Rabo less for on-call scheduling than PRN perfusionists were paid, *id.* ¶¶ 72, 77; (6) told Rabo she was

---

*See AmSECT's Standards and Guidelines*, AmSECT, https://amsect.org/policy-practice/amsects-standards-and-guidelines (last visited June 11, 2026). AmSECT's guidelines "are what AmSECT has determined are the minimum requirements for safe cardiopulmonary bypass." *Id.*

[5]   A "locum" or "locum tenens" refers to "one filling an office for a time or temporarily taking the place of another." *Locum tenens*, Merriam Webster, https://www.merriam-webster.com/dictionary/locum%20tenens (last visited June 11, 2026).

"'difficult to deal with' and insinuated he would fire her" when she requested schedule changes or additional compensation, *id.* ¶ 74.

On September 30, 2024, Rabo reported to Essentia human resources that Neugebauer had discriminated against her based on her gender, race, and national origin. *Id.* ¶ 76.   Rabo wrote:

> My name is Sylvia Rabo, and I am writing to formally report the discrimination I have experienced from my immediate manager, Duane Neugebauer.  This treatment has been severe, pervasive, and appears to be motivated by gender, race, and national origin[.]
>
> As the only full-time, Black female chief perfusionist, my input is consistently dismissed, ignored, and considered last when it comes to the monthly scheduling.  For example, Duane informed PRN staff, specifically a White male, that the intention was not for him to handle all the cases during the week he was scheduled.  However, since the death of our other full-time staff, I have been handling 90-95% of the cases at the hospital.   When I requested help with locum support or additional compensation, Duane responded by stating I would not be paid because I would "lay around and do nothing" on days without cases.  He suggested that he rather [sic] replace me with Locums.
>
> The hospital is intended to have two full-time perfusionists.  It was acceptable to have slow periods when there were two of us, but now, being the sole full-time staff, the workload has become a lot.  Despite this, PRN staff are compensated generously with overtime on slow days and other incentives, while my requests have been ignored.
>
> Additionally, Duane frequently compares my work ethic to that of his daughter, also a perfusionist, which I find inappropriate and demeaning.  On Thursday, September 26, 2024, I went to Duane's office to discuss the November schedule, which I felt was unfair to me.  Instead of addressing my concerns, he called me "difficult to deal with" and mentioned how he recently fired someone.

> This behavior has created a hostile work environment for me. I love working at Essentia Health, and I am respectfully asking for this issue to be resolved.

*Id.*; *see* ECF No. 18-1 at 3–5.  On October 16, 2024, Essentia human resources notified Rabo that it had investigated but did not substantiate that the discrimination or hostile work environment described in Rabo's September 30 email had occurred.  Am. Compl. ¶ 78.

On November 11, 2024, Neugebauer agreed to provide Rabo with additional pay for each call shift, but only until a second perfusionist was hired at the end of June 2025. *Id.* ¶¶ 79–80.  Rabo received additional pay for November and December 2024.  *Id.* ¶ 81. But beginning in January 2025, Neugebauer stopped scheduling Rabo for fifteen consecutive days, resulting in a reduction in Rabo's call pay.  *See id.* ¶¶ 82–83, 91.  Rabo also took issue with Neugebauer instructing another person to handle PRN perfusionists' questions or orientation; Rabo believed these duties should be hers as Chief Perfusionist, and that giving them to someone else undermined her credibility.  *Id.* ¶¶ 84–85.  On December 18, 2024, Rabo wrote to Essentia's human resources department to complain about these on-call scheduling issues.  *See id.* ¶ 91.

Neugebauer hired his daughter, Corie Bellefeuille, as a PRN perfusionist to cover Rabo's vacation during the week of December 22, 2024.  *Id.* ¶ 86.[6]  At some point that is

---

[6]    Bellefeuille and Rabo had interacted prior to Bellefeuille's coverage of Rabo's vacation.  After she became a perfusionist in June 2023, Bellefeuille visited Essentia at some point that is not identified in the Amended Complaint.  At that time, Bellefeuille refused to allow Rabo to "personally orient [her] to [Essentia's] policies and procedures." Am. Compl. ¶ 88.  On November 11, 2024, Bellefeuille filed a complaint with Essentia's human resources department, claiming that Rabo's attempts to orient her at this visit were inappropriate.  *Id.* ¶ 90.

not clear from the Amended Complaint, Bellefeuille complained to Rabo and Neugebauer about scheduling, the department's use of expired equipment, the understocking of supplies, and the absence of teamwork within the department. *See id.* ¶¶ 94–100. On December 30, 2024, Bellefeuille filed a human resources complaint against Rabo, reporting that Rabo failed to complete development conversations with PRN staff, engaged in hostile communications with other employees and staff, used expired items, failed to keep supplies stocked, and was not present on site when she should have been. *Id.* ¶ 109.

On January 14, 2025, Rabo notified Essentia's human resources that Bellefeuille refused to follow Rabo's directions or allow Rabo to orient her regarding the department's procedures. *Id.* ¶ 111. On January 20, 2025, Rabo asked Essentia human resources to reopen her case against Neugebauer regarding "ongoing discrimination and harassment." *Id.* ¶ 113.

On February 20, 2025, Neugebauer placed Rabo on a Performance Improvement Plan (or "PIP") because Rabo's "performance had fallen below expected levels." *Id.* ¶ 116. The PIP identified concerns regarding Rabo's performance and future expectations regarding her improved performance. *See id.* ¶¶ 117, 141. Rabo disputes these concerns, and she alleges that Moser and other male PRN perfusionists were not held to the same expectations. *See id.* ¶¶ 122, 128, 134, 177–81. As part of the PIP, Rabo was required to check in and out with Neugebauer every day. *See id.* ¶ 179.

Rabo alleges that from February 28 to May 16, 2025, Neugebauer made sexually suggestive and racially inappropriate gestures and remarks to Rabo at her PIP-required check-ins. *Id.* ¶¶ 186–90. Neugebauer made sexually suggestive comments, commented

7

on Rabo's anatomy, called Rabo racial epithets, and touched his genitals in Rabo's presence. *Id.* ¶ 190. Following the first of these two incidents—in which "Neugebauer mentioned with an air kiss and a wink that Rabo could come to his office" an hour early and suggested the same several days later "with a wink and a sexually suggestive lick of his tongue"—Rabo took a six-week FMLA leave "for a mental break" starting March 7, 2025. *Id.* ¶¶ 186–88.

At a PIP follow-up meeting on May 16, 2025, with Neugebauer and an Essentia human resources representative, Rabo mentioned that between surgeries she "took lactation breaks," because she was a nursing mother and "needed to go to the bathroom to express breast milk." *Id.* ¶¶ 191, 196–98. According to Rabo, "Neugebauer expressed his disbelief and indicated he did not like the fact Rabo was going to the bathroom to pump breast milk where he could not find her." *Id.* ¶ 199.

On May 20, 2025, Rabo filed a complaint with Essentia human resources, complaining of "discrimination, harassment and retaliation since February 21, 2025." *Id.* ¶ 202. Rabo complained of being: (1) placed on PIPs with vague goals; (2) required to report to Neugebauer at check-ins that were "uncomfortable and at time hostile since he made bullying remarks and used racial slurs directed at her"; (3) "[a]ccused of leaving expired items in the pump room"; (4) required to provide accounts of her whereabouts, with her badge activity monitored and others being instructed to observe her actions; and (5) "[s]ubjected to disbelief and dismissiveness when she explained to Neugebauer that she used a breast pump during breaks." *Id.* Rabo complained that Neugebauer's behavior was "unacceptable and has created a hostile and unsafe work environment" and that his

behavior had "persisted and escalated" despite Rabo's "several attempts to address [Neugebauer's] discriminatory and retaliatory actions." *Id.* That same day, Neugebauer changed Rabo's position to "scout nurse," which Rabo asserts "undermined her credibility as the Chief Perfusionist" since it did not "require the same high level of professional credentialling as a perfusionist." *Id.* ¶¶ 203–04; *see id.* ¶ 206 (describing scout nurse as "a non-sterile member of a surgical team" that "coordinat[es] the operating rooms' activities" and "monitor[s] the intra-operative environment and aseptic status of the sterile team").

Neugebauer's sexually and racially inappropriate comments continued between May 20 and May 27, 2025. *See id.* ¶ 208. On May 28, 2025, Rabo again complained to Essentia's human resources department, stating that "as a Black female she felt unsafe during her morning check-ins with Neugebauer." *Id.* ¶¶ 209–10. Rabo stated that the check-ins and check-outs with Neugebauer were "hurtful" and "requir[ed] the victim to return to the abuser on a daily basis." *Id.* ¶ 210. Rabo requested that the PIP check-ins be stopped. *Id.* ¶ 209. On May 30, "Rabo again requested FMLA leave due to the effect of Neugebauer's outrageous actions on her emotional and mental state." *Id.* ¶ 211. Essentia granted the leave. *Id.* At the end of her May 30 shift, Rabo's access to Essentia's email and work portal were blocked. *Id.* ¶ 212.

On June 4, 2025, during a meeting between Rabo, Neugebauer, and an unnamed Essentia human resources representative, Rabo's employment was terminated. *Id.* ¶ 213. Neugebauer replaced Rabo with his daughter, Bellefeuille, who Rabo believes was given the chief perfusionist position. *Id.* ¶¶ 216–17. In a letter dated June 11, 2025, Essentia

wrote that Rabo was terminated because she "failed to meet the performance expectations of [her] role" and her "performance created undue safety risks for patients and substantially interfered with [Essentia's] business operations." *Id.* ¶ 218.

Rabo filed this case in St. Louis County, Minnesota District Court on November 14, 2025. ECF No. 1-1. On November 21, 2025, Essentia removed the case based on diversity jurisdiction. *See* ECF No. 1.[7] Rabo asserts six claims in her Amended Complaint: a claim

---

[7] There is subject-matter jurisdiction over this case, but why this is so deserves a brief explanation. Rabo filed this case originally in St. Louis County, Minnesota District Court. ECF No. 1-1. Before being served with the Complaint (more on that in a bit), Essentia removed the case to this court, alleging there is federal subject-matter jurisdiction under the general diversity statute, 28 U.S.C. § 1332(a)(1). ECF No. 1 ¶¶ 5–11. "To remove a case from a state court to a federal court, a defendant must file in the federal forum a notice of removal 'containing a short and plain statement of the grounds for removal.'" *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 83 (2014) (quoting 28 U.S.C. § 1446(a)). In *Dart*, the Supreme Court interpreted § 1446(a)'s "short-and-plain-statement" requirement to mean that a removing defendant must include factual allegations in its notice of removal plausibly showing that statutory jurisdictional prerequisites are met. *Id.* at 87–89. Here, in other words, *Dart* required Essentia to allege facts plausibly showing that it and Rabo were citizens of different states and that the amount in controversy exceeded "$75,000, exclusive of interest and costs." 28 U.S.C. § 1332(a)(1). Essentia did that. In it notice of removal, Essentia plausibly alleged that Rabo is a North Dakota citizen, that it is a Minnesota citizen, and that the amount in controversy exceeds $75,000. ECF No. 1 ¶¶ 5–11.

But there is a wrinkle. Though Essentia is a Minnesota citizen—meaning the forum-defendant rule in 28 U.S.C. § 1441(b)(2) would ordinarily have prevented it from removing the case—Essentia asserted in its notice of removal that "[t]he forum defendant rule . . . does not apply to this removal because the forum defendant (Essentia) ha[d] yet to be 'properly . . . served.'" ECF No. 1 ¶ 8 (quoting 28 U.S.C. § 1441(b)(2)). The Eighth Circuit has not decided whether this so-called "snap removal" is proper. *See M & B Oil, Inc. v. Federated Mut. Ins. Co.*, 66 F.4th 1106, 1109–10 (8th Cir. 2023); *Mosley v. First Student, Inc.*, No. 4:25-CV-1440-CMS, 2025 WL 3466952, at *3 (E.D. Mo. Dec. 3, 2025). But it doesn't matter here. The Eighth Circuit has held "that violation of the forum-defendant rule is a nonjurisdictional defect in removal that is waived if not raised in '[a] motion to remand . . . made within 30 days after the filing of the notice of removal.'" *Holbein v. TAW Enters., Inc.*, 983 F.3d 1049, 1053 (8th Cir. 2020) (en banc) (quoting 28 U.S.C. § 1447(c)). Here, Rabo did not file a motion to remand.

of discrimination based on "race, gender, sex, and/or national origin" in violation of the North Dakota Human Rights Act, N.D. Cent. Code § 14-02.4-03, Am. Compl. ¶¶ 235–39 (Count I); a claim of sex discrimination based on sexual harassment, including hostile work environment and quid-pro-quo termination, in violation of the North Dakota Human Rights Act, N.D. Cent. Code § 14-02.4-03, Am. Compl. ¶¶ 240–50 (Count II); a claim of retaliation in violation of the anti-retaliation and whistleblower-protection provision of the North Dakota Human Rights Act, N.D. Cent. Code § 14-02.4-18, Am. Compl. ¶¶ 251–54 (Count III); a common-law claim of negligent supervision and retention, *id.* ¶¶ 255–59 (Count IV); a common-law claim of retaliation and wrongful termination in violation of public policy, *id.* ¶¶ 260–63 (Count V); and a common-law claim of intentional infliction of emotional distress, *id.* ¶¶ 264–72 (Count VI). Though the Amended Complaint does not specify a source of law underlying the common-law claims, Rabo's counsel confirmed at the hearing on this motion that the common-law claims arise exclusively under North Dakota law. Tr. (rough) at 12.

## II

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept all the complaint's factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that

11

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Considering "matters outside the pleadings" generally transforms a Rule 12(b)(6) motion into one for summary judgment, but not when the relevant materials are "necessarily embraced" by the pleadings. *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017). Materials embraced by the complaint include "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003) (quoting *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir. 1996)). Here, Essentia has submitted seven documents, each of which is referenced in the Amended Complaint. *See* ECF No. 18, Exs. A–G. Rabo does not challenge the authenticity of these documents, meaning they may be considered without converting this motion into one for summary judgment.

## III

Essentia seeks the dismissal of Counts II, IV, V, and VI, and the claims will be analyzed in that order.

## A

The North Dakota Human Rights Act prohibits sex discrimination, including sexual harassment. The Act characterizes "sexual harassment" as a "discriminatory practice," and defines sexual harassment as including "unwelcome sexual advances, requests for sexual favors, sexually motivated physical conduct or other verbal or physical conduct or communication of a sexual nature when . . . [t]hat conduct or communication has the

purpose or effect of substantially interfering with an individual's employment." N.D. Cent. Code §§ 14-02.4-02(6), 14-02.4-03(1). The Act limits an employer's liability for hostile-work-environment sexual harassment perpetrated by its employees to those situations where the employer "knows or should know of the existence of the harassment and fails to take timely and appropriate action." N.D. Cent. Code § 14-02.4-02(6)(c). The North Dakota Supreme Court has explained that a claim for hostile work environment under the Act

> requires proving five elements: (1) the employee belongs to a protected class; (2) the employee was subject to unwelcome sexual harassment; (3) the sexual harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take proper remedial action.

*Hysjulien v. Hill Top Home of Comfort, Inc.*, 827 N.W.2d 533, 544 (N.D. 2013) (citation modified).

The Amended Complaint does not allege facts plausibly showing that Essentia knew or should have known of the harassment Rabo alleges. According to the Amended Complaint, Neugebauer's sexual harassment occurred between February 28 and May 27, 2025. *See* Am. Compl. ¶¶ 186, 190, 208, 246. As part of Count II, the Amended Complaint alleges that "beginning on . . . February 28, 2025, Rabo was subjected to unwelcome and ongoing inappropriate sexual gestures and remarks by Neugebauer during her required check-ins and check-outs," including Neugebauer's "sexually explicit comments and innuendos," "leering and suggestive gestures," "unwanted sexual advances," and "sexually charged behavior." *Id.* ¶ 246 (citation modified). Although Rabo alleges that she "reported

13

the sexual harassment to HR," *see id.* ¶ 247, this general allegation is based on specific reports that do not mention or plausibly implicate sexual harassment. Rabo's first complaint to Essentia's human resources area after Neugebauer's sexually harassing behavior began occurred by email on May 20, 2025. *Id.* ¶ 202. In that email, Rabo reported that the check-ins with Neugebauer were "uncomfortable, and at times, hostile," that Neugebauer "made bullying remarks" and used "racial slurs," and that his behavior was "abusive." ECF No. 18-1 at 18. The May 20 email did not mention sexual harassment or describe the specific sexual-harassment incidents alleged in the Amended Complaint. *See* Am. Compl. ¶¶ 186, 190. Rabo's subsequent May 28, 2025 email complained that the PIP check-ins and check-outs were "programmed by [Neugebauer] in a way that was intentionally to be hurtful," and that reporting to him "requir[ed] the victim to return to the abuser on a daily basis." ECF No. 18-1 at 22. Again, there was no mention of sexual harassment.

The arguments Rabo advances to defend her hostile-environment claim are not persuasive. Rabo first argues that her pre–February 2025 complaints put Essentia on notice of Neugebauer's sexual harassment. *See* ECF No. 21 at 23–24, 26. It is difficult to understand how that might be so. The Amended Complaint does not allege that Neugebauer engaged in sexual harassment until February 28, 2025, months after Rabo's earlier complaints. Rabo characterized her September 30, 2024 complaint as regarding "gender, race, and national origin" discrimination, and the complaint itself focused on Rabo's disagreements with Neugebauer about scheduling, workload, and benefits, though it also described Rabo's claims that white males were being treated more favorably than

14

she was. *See* Am. Compl. ¶ 76. Rabo's December 18, 2024 complaint concerned scheduling and call-pay issues, not sexual harassment. *See id.* ¶ 91. And there is no allegation that Rabo's January 14 and 20, 2025 complaints to Essentia's human resources had anything to do with sexual harassment. *See id.* ¶¶ 111, 113. Rabo's January 14 complaint concerned Bellefeuille's alleged refusal to submit to Rabo's supervisory authority. *See id.* ¶ 111. On January 20, 2025, Rabo "requested HR reopen her case against Neugebauer with respect to the ongoing discrimination and harassment she had been experiencing," *id.* ¶ 113, but (again) the Amended Complaint does not allege that Rabo was experiencing sexual harassment by that time. In sum, no allegations plausibly show that Essentia knew, or should have known, that Rabo was being subjected to sexual harassment based on her complaints to Essentia before February 28, 2025, the earliest date that any sexual harassment is alleged to have occurred.

Rabo next argues that Essentia was on notice of Neugebauer's sexual harassment by virtue of his role as supervisor. ECF No. 21 at 24 ("Essentia was on notice of the sexual harassment because Neugebauer, the director of the Cardiovascular Department at Essentia's Fargo location, *was* the harasser."). Citing *Hysjulien*, Rabo argues that North Dakota recognizes imputed knowledge when the sexual harassment is conducted by a supervisor. ECF No. 21 at 27. In *Hysjulien*, the plaintiff (Hysjulien) brought hostile work environment claims under both the North Dakota Human Rights Act and Title VII against her employer (Hill Top) and its CEO (Armitage) after Armitage allegedly sexually assaulted Hysjulien when they attended a work conference. 827 N.W.2d at 537. Hysjulien alleged that after she rebuffed Armitage's advances, she was subject to hostile and different

15

treatment. *Id.* at 537–38. There, as here, Hysjulien did not notify anyone at Hill Top of Armitage's behavior. In analyzing the timeliness of Hysjulien's Title VII claim, the North Dakota Supreme Court explained:

> Armitage's conduct in the alleged assault, as Hill Top's administrator and chief executive officer, may alone have established liability on a hostile work environment theory had Hysjulien timely complained of the assault. Because Hysjulien did not timely complain of the assault, the length of time passing before she filed her administrative charge means the assault cannot form the basis for the hostile work environment liability unless she shows Armitage's later alleged conduct had some relation to the sexual assault.

*Id.* at 548 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002)). The case does not support Rabo's supervisor-imputation argument.

Rabo cites several other Title VII and Minnesota Human Rights Act ("MHRA") cases for the proposition that knowledge of Neugebauer's harassment should be imputed to Essentia. *See* ECF No. 21 at 28–30. These cases are unhelpful. Unlike the North Dakota Human Rights Act, which imposes liability on the employer only "if it knows or should know of the existence of the harassment and fails to take timely and appropriate action," N.D. Cent Code § 14-02.4-02(6)(c), Title VII and the MHRA impute knowledge to the employer unless the employer can show that "(a) [the employer] exercised reasonable care to prevent and promptly correct sexual harassment, and (b) the employee unreasonably failed to take advantage of the preventive or corrective measures provided." *See Bush v. Penske Truck Leasing Co.*, No. 06-cv-1110 (RHK/AJB), 2007 WL 1321853, at *3 (D. Minn. May 4, 2007) (first citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); and then citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)); *see id.*

16

(describing the Minnesota Legislature's amendment to the MHRA's definition of sexual harassment to remove the language requiring that the employer "knows or should know" of the harassment, so that "the definition of sexual harassment in the MHRA is now nearly identical to the definition of sexual harassment in Title VII"); *see also* Minn. Stat. § 363A.03, subdiv. 43 (defining "sexual harassment"); 29 C.F.R. § 1604.11(a) (same).

Rabo's claim that she was terminated for rejecting Neugebauer's sexual advances will not be dismissed. Rabo alleges that her "refusal to submit to and her rejection of Neugebauer's sexual advances led to her termination," in violation of North Dakota Century Code section 14.02.4-02(6)(b). Am. Compl. ¶ 249. This subsection provides that "[s]exual harassment includes unwelcome sexual advances, requests for sexual favors, sexually motivated physical conduct or other verbal or physical conduct or communication of a sexual nature when . . . [s]ubmission to or rejection of that conduct . . . by an individaul is used as a factor in decision affecting that individual's employment." N.D. Cent. Code § 14.02.4-02(6)(b).[8] The Amended Complaint alleges that on May 27, 2025, Neugebauer told Rabo that they were "safe here to do whatever we want," to which Rabo responded "No thank you!" Am. Compl. ¶ 208. Three days later, Rabo's access to her email and work portal were blocked. *Id.* ¶ 212. And a week later, Rabo was terminated. *Id.* ¶ 213.

Essentia makes three arguments to support dismissal of this aspect of Rabo's claim, but none is convincing. First, Essentia argues Rabo's claim should be characterized as a hostile-environment claim under North Dakota Century Code section 14-02.4-02(6)(c),

---

[8]    Neither party cited, and the Court's independent research has not identified, cases addressing this type of quid-pro-quo claim under North Dakota law.

17

requiring notice to Essentia. ECF No. 22 at 10. I disagree. A claim that an employee was terminated (or suffered some other adverse employment action) because she refused to submit to unwelcome sexual advances is distinct from a hostile-environment claim. Section 14-02.4-02(6)(b) is an independent subsection of section 14-02.4-02(6), and it contains no employer-knowledge requirement. Second, Essentia argues that Rabo "does not so much as plead that she reasonably viewed this comment as one that was sexual in nature," or that she "refused Neugebauer's unwelcome sexual advances." *See* ECF No. 22 at 10. According to Essentia, "given the wide variation of comments alleged in the Complaint," an inference cannot be drawn that Rabo viewed this comment as sexual in nature. *Id.* Again, I disagree. Read in the context of the Amended Complaint's allegations, it is at least plausible that Rabo reasonably viewed Neugebauer's "we're safe to do whatever we want" comment as sexual in nature. *See* Am. Compl. ¶¶ 190, 208. Third, Essentia argues that the "safe here to do whatever we want" statement was made in the context of Rabo and Neugebauer discussing appropriate places to breastfeed. ECF No. 22 at 10–11 (citing Am. Compl. ¶¶ 196–99). The Amended Complaint alleges that Rabo and Neugebauer's discussion regarding breastfeeding locations occurred on May 16, 2025. *See id.* ¶¶ 191–199. Neugebauer's "safe here to do whatever we want" statement occurred on May 27, 2025. *Id.* ¶ 208.

B

A claim for negligent supervision arises under North Dakota law "when an employer fails to exercise ordinary care in supervising the employment relationship to prevent the foreseeable misconduct of an employee from causing harm to other employees

18

or third persons." *Koehler v. County of Grand Forks*, 658 N.W.2d 741, 749 (N.D. 2003). To succeed on a negligent-retention claim, the plaintiff must show: "(1) a duty of care owed by an employer to a third person; (2) breach of that duty; and (3) injury to the third person proximately caused by the employer's breach." *Richard v. Washburn Pub. Schs.*, 809 N.W.2d 288, 297 (N.D. 2011) (quoting *Gingerich v. City of Elkhart Prob. Dep't*, 273 F.R.D. 532, 538 (N.D. Ind. 2011)). "Imposition of a duty is limited to those instances where a reasonably foreseeable victim is injured by a reasonably foreseeable harm." *Id.* (quoting *Gingerich*, 273 F.R.D. at 538). An employer can be liable for employees who are "in the habit of misconducting themselves in a manner dangerous to others." *Id.* (quoting *Gingerich*, 273 F.R.D. at 538).

Rabo alleges that Essentia negligently supervised or retained Neugebauer because Essentia

> knew or should have known that Neugebauer posed a risk of engaging in sexually inappropriate conduct with Rabo during the daily check-ins and check-outs when she was forced to go alone to his office every morning and afternoon and she notified HR that she felt unsafe during these check-ins and check-outs and she was a victim being forced to return to her abuser.

Am. Compl. ¶ 257. But as just explained, the Amended Complaint does not plausibly allege that Rabo reported Neugebauer's sexually harassing conduct and thus does not allege facts supporting Essentia's knowledge that Neugebauer posed a risk.

Rabo cites cases that she says show this claim is plausible, but they don't. The cases Rabo cites make clear that sexual harassment is deemed foreseeable for purposes of a negligent supervision claim where (1) the employer was given notice of the inappropriate

19

conduct, *see Richard*, 809 N.W.2d at 297–98 (finding issue of fact where, once misconduct was reported, school district failed to address misconduct and subsequent misconduct occurred), or (2) the nature of the relationship between the employee and the abused creates a potential for sexual abuse, *see Nelson v. Gillette*, 571 N.W.2d 332, 343 (N.D. 1997) ("Because of the known risk of sexual activity present in the unequal power relationship of counseling between a social worker and a child-ward, the potential of sexual contact between a male counselor and a female child-client raises questions of fact."); *Doe YZ v. Shattuck–St. Mary's Sch.*, 214 F. Supp. 3d 763, 786 (D. Minn. 2016) (noting the record included evidence that sexual abuse of students by teachers was a recognized danger prior to teacher's abuse of students, causing the Minnesota Legislature to enact mandatory reporting laws). Neither of these circumstances is present here. There are no allegations that Essentia had notice, and nothing about Neugebauer's relationship with Rabo made sexual harassment inherently foreseeable. Rabo also argues that "volumes of cases in which supervisors abused their power" requiring employers to create anti-discrimination guidelines, handbooks, and policies demonstrate that a supervisor's discrimination and harassment is foreseeable. *See* ECF No. 21 at 33–34. Rabo cites no case adopting this position, and it is difficult to understand how the theory would not swallow the foreseeability rule.

Essentia argues that Rabo's claim also fails because "there can be no 'independent claim for negligent supervision in an employment case where the injury suffered by the plaintiff employee is the loss of employment—at least absent a physical injury.'" ECF No. 17 at 20 (quoting *Kongelf v. Sears Holding Corp.*, No. 4:09-cv-038, 2010 WL 1977955, at

*4 (D.N.D. Apr. 12, 2010), *R. & R. adopted*, 2010 WL 11627810 (D.N.D. May 4, 2010)). Rabo acknowledges this is the law, but she argues that claims of sexual harassment are an exception to the physical-injury requirement. *See* ECF No. 21 at 35–36 (citing *Thompson v. Olsten Kimberly Qualitycare, Inc.*, 980 F. Supp. 1035, 1041 (D. Minn. 1997) (stating that "a plaintiff enjoys a more expansive concept of what constitutes a threat of physical injury when the case involves allegations of sexual harassment")). The problem with this contention is that *Thompson* is a case brought under Minnesota law, and Rabo identifies no North Dakota authority adopting that approach.

C

North Dakota recognizes a "limited public policy exception[] to the at-will [employment] rule if employees establish they were terminated in retaliation for complying with a clear public policy." *Anderson v. Meyer Broad. Co.*, 630 N.W.2d 46, 53 (N.D. 2001). "[P]ublic policy must be evidenced by a constitutional or statutory provision." *Jose v. Norwest Bank N.D., N.A.*, 599 N.W.2d 293, 299 (N.D. 1999); *see Lee v. Walstad,* 368 N.W.2d 542, 547 (N.D. 1985) (refusing to recognize public policy exception to at-will employment where claimant "defined no clear public policy which his removal violates").

This claim will be dismissed because the alleged public policy is not evidenced by a constitutional provision, statute, or regulation. The Amended Complaint alleges that Rabo was retaliated against and terminated for complaining about long working hours and safety issues.[9] Am. Compl. ¶ 261. Rabo identifies three sources of alleged "public policy"

---

[9]     Count V also alleges that Rabo was retaliated against in violation of public policy for "reporting unlawful discrimination and/or harassment." Am. Compl. ¶ 261. Essentia

21

to support her claim, but none of them works.  She first tethers her claim to the AmSECT

standards.  *See* ECF No. 21 at 38–39.  The AmSECT staffing guidelines, however, are

promulgated by a professional organization (not a governmental body), and by their own

terms, they are "not mandatory."  *See AmSECT's Standards and Guidelines*, AmSECT,

https://amsect.org/policy-practice/amsects-standards-and-guidelines (last visited June 11,

2026).  The AmSECT guidelines thus cannot form the basis for a public-policy/retaliation

claim under North Dakota law.  *See Jose*, 599 N.W.2d at 299 ("[P]ublic policy must be

evidenced by a constitutional or statutory provision.").   Rabo next cites the Fair Labor

Standards Act and Occupational Safety and Health Administration rules regarding work

hours and worker safety.  *See* ECF No. 21 at 39–42.  However, Rabo points to no specific

statutory or regulatory provision that she claims was violated.  *See id.*

D

In Count VI, the Amended Complaint alleges that Essentia is vicariously liable for

intentional infliction of emotional distress caused by Neugebauer's racial slurs and sexual

harassment.  Am. Compl. ¶¶ 264–272.  Under North Dakota law, "an employer is liable

---

argues that "the presence of a statutory remedy for a violation of an anti-discrimination statute precludes a common law action based on violation of a policy against discrimination," ECF No. 17 at 21–22 (quoting *Bakken v. N. Am. Coal Corp.*, 641 F. Supp. 1015, 1023 (D.N.D. 1986)).  Essentia maintains that Rabo's public policy claim is precluded on this basis because the North Dakota Human Rights Act includes a remedy for retaliation via its anti-discrimination laws, including the claim at Count III.  ECF No. 17 at 22.  In her response brief, Rabo focuses only on long hours and working safety to support Count V, and she does not address the "reporting unlawful discrimination" aspect of her claim, *see* ECF No. 21 at 36–42.  This means she has waived any challenge to this specific argument.  *See Hassan v. Amazon.com Servs., LLC*, No. 23-cv-1470 (ECT/DLM), 2025 WL 591313, at *7 (D. Minn. Feb. 24, 2025) (collecting waiver cases).

22

for tortious acts of its employees committed while they are acting within the scope of employment." *Van Klootwyk v. Baptist Home, Inc.*, 665 N.W.2d 679, 685 n.2 (N.D. 2003). "The general rule is that sexual harassment by a supervisor is not conduct within the scope of employment." *Burlington Indus.*, 524 U.S. at 757. "Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or little actuated by a purpose to serve the master." *Nelson*, 571 N.W.2d at 335 (quoting *Restatement (Second) of Agency*, § 228 (A.L.I. 1958). Without more, these general rules would bar this claim.

Rabo says there is more. She cites Minnesota cases applying vicarious liability to an employer for its employee's intentional torts, but the cases themselves show that Minnesota law is different. *See* ECF No. 21 at 44–46 (first citing *Fahrendorff ex rel. Fahrendorff v. North Homes, Inc.*, 597 N.W.2d 905, 910 (Minn. 1999); then citing *Lange v. Nat'l Biscuit Co.*, 211 N.W.2d 783, 785 (Minn. 1973); and then citing *Marston v. Minneapolis Clinic of Psychiatry & Neurology, Ltd.*, 329 N.W.2d 306, 311 (Minn. 1982)). Rabo cites an unpublished decision from the District of North Dakota for the premise that a claim of vicarious liability for intentional infliction of emotional distress exists, but that case is likewise unhelpful. ECF No. 21 at 48 (citing *Steele v. ExxonMobil Oil Corp.*, No. 1:23-cv-133, 2024 WL 1741341, at *4–5 (D.N.D. Apr. 23, 2024)). *Steele* did not address vicarious liability—it addressed the liability of two companies for retaliating against Steele after she filed an ERISA lawsuit against the companies. 2024 WL 1741341, at *4–5. The court addressed whether the defendants' alleged actions rose to the level of extreme and outrageous conduct required under North Dakota law—not whether vicarious liability was

23

appropriate. *Id.* Here, the issue of whether Neugebauer's conduct was extreme and outrageous has not been raised. *See* ECF No. 22 at 16 (clarifying that "[t]his issue is not before the Court on Essentia's motion").

Rabo argues that Neugebauer's conduct taken as a whole (including making her work long hours, calling her lazy, accusing her of violating the rules, and placing her on a PIP) should be considered when determining if Neugebauer's sexual harassment fell within the scope of his employment under North Dakota law. *See* ECF No. 21 at 50–52. But Rabo's intentional-infliction-of-emotional-distress claim is not based on this theory, *see* Am. Compl. ¶¶ 264–72, and Rabo cannot amend her complaint through a brief, *see* *Al-Saadoon v. Barr*, 973 F.3d 794, 805 (8th Cir. 2020) ("It is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss." (citation modified)). If Rabo were allowed to amend the complaint, the general rule is that such "routine employment management functions," ECF No. 22 at 16, do not rise to intentional infliction of emotional distress as a matter of law. *See Krause v. Bobcat*, 297 F. Supp. 2d 1212, 1219 (D.N.D. 2003) ("While a termination certainly causes stress and mental anguish in the person being terminated, it is not conduct that is so extreme and outrageous that it goes beyond all possible bounds of decency." (citation omitted)); *Dahlberg v. Lutheran Soc. Servs. of N.D.*, 625 N.W.2d 241, 249 (N.D. 2001); *Sadler v. Basin Elec. Power Coop.*, 409 N.W.2d 87, 90 (N.D. 1987).

24

## ORDER

Therefore, based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT** Defendant Essentia Health's Partial Motion to Dismiss Amended Complaint [ECF No. 15] is **GRANTED IN PART AND DENIED IN PART** as follows:

1.      Count II is **DISMISSED WITHOUT PREJUDICE**, but only to the extent it asserts a hostile-work-environment sexual-harassment claim.

2.      Counts IV, V, and VI are **DISMISSED WITHOUT PREJUDICE**.

Dated: June 12, 2026                  s/ Eric C. Tostrud
                                          Eric C. Tostrud
                                          United States District Court